**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **REXEL USA, INC.** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CASE NO.** 4:23-cv-3828 |
| | § | |
| **RK MISSION CRITICAL, LLC; and** | § | **JURY TRIAL DEMANDED** |
| **RK INDUSTRIES, LLC** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFF REXEL USA, INC.'S ORIGINAL COMPLAINT AND JURY DEMAND**

Plaintiff Rexel USA, Inc. ("Rexel") respectfully files this complaint against Defendants RK Mission Critical, LLC ("RKMC" or "Mission Critical") and RK Industries, LLC ("RK"), and hereby alleges the following:

**I.     NATURE OF THE ACTION AND SUMMARY OF CLAIMS.**

1.     This is a suit to recover over $9,000,000 owed to Rexel for custom commercial goods Defendant RKMC purchased from Plaintiff Rexel, plus associated storage fees, finance fees, and costs (including attorneys' fees) resulting from RKMC's breach of its contractual duties to accept and pay for the items it ordered.

2.     Rexel is a wholesale distributor of electrical supplies and services in the industrial, commercial and residential markets throughout the United States.  During the first half of 2022, RKMC placed urgent orders with Rexel for millions of dollars of electrical components specific to RKMC manufacture or mobile computing containers.

3.     Rexel took certain precautions before entering into binding contracts with its own suppliers to fulfill RKMC's orders.

1

4.    First, Rexel asked for assurances that RKMC had the resources to pay for the items it was ordering.  Defendant RK—which is a self-described "holding company" that claims RKMC as one of its seven "business units"—responded directly to Rexel, with an email from RK's CFO attaching a recent **RK** balance sheet showing over $33 million in assets that exceeded its liabilities. Rexel then allowed RKMC to place orders on credit.

5.    Second, because RKMC's orders were custom products and/or extremely large quantities, Rexel's suppliers insisted that most of the orders be non-cancellable and non-refundable.  Accordingly, before ordering the goods for RKMC, Rexel provided RKMC each manufacturer's specific cancellation policy in writing and emphasized that if RKMC cancelled any orders after they were placed, RKMC would be liable to Rexel for any charges the manufacturer imposed up to and including payment in full.  RKMC chose to proceed.

6.    With these steps taken, Rexel entered binding contracts with its suppliers to fulfill RKMC's orders.  As the goods arrived, Rexel began tendering them to RKMC pursuant to the parties' written terms of sale.  RKMC initially accepted delivery of Rexel's shipments and timely paid its invoices.  But in July 2022, RKMC suddenly asked Rexel to cancel its outstanding orders, claiming that RKMC's customer had run out of money.  Rexel did its best, but for the most part the manufacturers either refused to cancel, or imposed cancellation fees up to 100% of the contract price pursuant to their rights under the cancellation policies RKMC had accepted.

7.    RKMC subsequently refused to accept delivery of any further goods, reduced the payments it made to only a fraction of its growing balance, and then ceased paying altogether.

8.    Notwithstanding Rexel's repeated demands, RKMC now refuses to pay for over $8.9 million in orders it undisputedly placed, for the over $300,000 in cancellation fees incurred

pursuant to the cancellation policies RKMC accepted, or even for the storage fees due under two bill-and-hold agreements the parties executed at RKMC's request.

9.      RKMC has never complained about the quality of Rexel's goods or performance. Instead, RKMC blames its default exclusively on a lack of available funds—which RKMC expressly attributes to under-funding from "Corporate,"—*i.e.* Defendant RK.

10.     Because Defendant RK operates RKMC as one of its business units and uses it as a mere instrumentality for the transaction of RK's affairs, RK is RKMC's alter-ego under Colorado law.  RKMC and RK are liable to Rexel for RKMC's debts, because RK is using RKMC's corporate form to perpetrate a wrong against Rexel: RK deliberately induced Rexel to extend credit to RKMC by indicating that RKMC's obligations were backed by RK's consolidated balance sheet showing a diversified portfolio of seven business units—but RK now refuses to release the funds needed to pay RKMC's obligations.  In the alternative, if RK is not liable as RKMC's alter ego, RK is liable to Rexel for tortious interference with the Rexel-RKMC contracts, because as RKMC itself has admitted, RK has ultimate authority over RKMC's expenditures and has been using that power to cause RKMC to withhold payment from Rexel.

11.     Rexel has fully upheld its end of the parties' bargain—including paying all amounts owed to the suppliers for RKMC's orders.  In return, Rexel has been left with a warehouse full of special-order items for which there is effectively no resale market, and almost $9 million in unpaid invoices.

12.     Rexel is entitled to judgment against both RKMC and RK, jointly and severally, for the injury Rexel suffered due to RKMC's failure to accept and pay for the goods it ordered.

## II.   PARTIES

13.     Plaintiff Rexel USA, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Dallas, Texas.

14.     Defendant RK Mission Critical, LLC is a member-managed limited liability company organized and existing under the laws of the State of Colorado.  Documents RKMC filed with the Texas Secretary of State in 2022 report the location of RKMC's principal office as 3800 Xanthia Street, Denver, Colorado 80238.  The same documents identify Jon Kinning as a Member and his brother Rick L. Kinning as a "governing person," and provide Colorado addresses for both. Rexel has been unable to identify any other RKMC Members using publicly available information. RKMC's registered agent for service in Texas is: Biz Filings, Inc., 701 Brazos Street, Ste. 720, Austin, TX 78701.

15.     Defendant RK Industries, LLC is a limited liability company organized and existing under the laws of the State of Colorado, with its principal place of business at 3800 Xanthia Street, Denver, Colorado 80238.   On information and belief, Rick Kinning[1] and Jon Kinning[2] are Members of RK.   Rexel has been unable to identify any other RK Members using publicly available information.   It can be served through its registered agent: Registered Agent Business Filings Incorporated, 7700 E Arapahoe Rd Ste 220, Centennial, CO 80112.

---

[1] Rick Kinning's biography on RK's website states, "In 1985, Rick assumed the role of majority owner when RK Mechanical, Inc. was incorporated. The company later underwent a name change in 2021 to better reflect its expanded offerings and became RK Industries, LLC." *See* https://rkindustries.com/about-us/leadership/ (last visited Sept. 25, 2023).

[2] Jon Kinning's LinkedIn page states, "Jon L. Kinning co-owns RK Industries, LLC." *See* https://www.linkedin.com/in/jonkinning (last visited Sept. 25, 2023).

### III.   VENUE AND JURISDICTION

16.     Venue is proper in this Court under 28 USCA § 1391(b) because a substantial part of the property involved in this dispute is located in Missouri City, Texas and a substantial part of the events or omissions giving rise to Rexel's claims occurred in Missouri City, Texas.  Under the "bill and hold" agreements between the parties, Rexel ordered, received, and stored more than $3.5 million worth of products for RKMC. Those bill and hold products are stored in warehouses in or around Houston, Texas.

17.     RKMC and RK are subject to personal jurisdiction in Texas because they purposefully availed themselves of the privilege of doing business in Texas, including by contracting to purchase the products underlying this dispute from a company in Texas, contracting to have certain of those products stored in this state, interfering with those contracts, and committing tortious injury felt in Texas by a corporation headquartered in Texas.

18.     This Court has subject matter jurisdiction because the amount in controversy exceeds $75,000 and, on information and belief, there is complete diversity between the Plaintiff and Defendants.[3]

### IV.   FACTS

#### A.     RKMC Seeks to Purchase Millions of Dollars of Custom Equipment from Rexel.

19.     Based in Texas, Plaintiff Rexel is America's premiere distributor of electronic equipment and supplies, with facilities located around the country.

---

[3] Both Defendants are Colorado LLCs. "'[A]n LLC, as an unincorporated association, takes the citizenship of all its members.'" *Gerson v. Logan River Acad.*, 20 F.4th 1263, 1269 (10th Cir. 2021) (quoting *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 781 F.3d 1233, 1234 (10th Cir. 2015) (modification in original)).  As noted above, Rexel does not have access to the information required to fully identify Defendants' membership.  However, Rexel has seen nothing to suggest that any member of either Defendant LLC shares Rexel's Texas citizenship.

20.     Defendant RK is a self-described "holding company" run by two brothers, Rick and Jon Kinning, who respectively serve as RK's Chairman/CEO and Executive Vice President/COO. According to information the Kinnings have posted online, RK is a Colorado-based "regional, national and international diversified service provider" that employs 1,800 people "in seven business units: Mechanical, Service, Steel, Energy, Water, Electrical and Mission Critical."[4] Though each business unit is formed as its own LLC, the Kinnings operate them as an integrated company under the RK umbrella.

21.     Defendant RKMC is Defendant RK's "Mission Critical" business unit; RKMC designs and manufactures custom infrastructure for specialized applications such as crypto-currency mining.

22.     Beginning in late 2021, RKMC sought to procure millions of dollars of custom-manufactured electronic components and supplies quickly, for an RKMC customer's project. Rexel quoted prices and terms to procure the goods RKMC needed (the "Products") from various Rexel suppliers.  RKMC accepted these terms by placing a series of orders that committed Rexel to procure and tender the Products, and RKMC to accept them and pay the specified prices.

23.     The parties' agreements, which are governed by Rexel's written Terms and Conditions of Sale ("Terms and Conditions") (Exhibit A) are memorialized in emails between the parties, custom quotes Rexel prepared for and sent to RKMC, purchase orders RKMC sent to Rexel, and invoices Rexel sent to RKMC.

---

[4] *See* https://www.linkedin.com/in/jonkinning and https://rk-foundation.org/board-of-directors/, both last visited Sept. 25, 2023.

**B.    RK Presents Its Own Balance Sheet as Evidence that RKMC Is Creditworthy, and in Reliance on RK's Financials, Rexel Allows RKMC to Order Products on Credit.**

24.    RKMC asked Rexel to extend net-30 payment terms, so it could order Products with no money down, then pay only after Rexel had procured them and tendered delivery.

25.    Before extending RKMC this credit—especially given the high dollar value of RKMC's orders—Rexel asked RKMC to prove that it had sufficient financial resources to meet its payment obligations.  In response, rather than RKMC providing any information specific to its business unit, *RK*'s Senior Vice President and CFO, Terry Bates, emailed Rexel executive Brendan O'Hare directly on January 18, 2022, under the subject line "RK Industries," saying: "Hi Brendan, Attached is our most current balance sheet.  Please let me know if you have any questions."  RK's CFO attached a single-page document presenting the "RK Industries LLC Consolidated Balance Sheet As of 11/30/2021."

26.    Thus, when Rexel asked for documentation of *RKMC*'s financial resources to assess its creditworthiness, Defendants provided *RK*'s consolidated balance sheet – which, because it reflected RK's seven diverse business units *including* RKMC, showed assets far in excess of the credit sought.  Because RK does no business with Rexel except through RKMC, there is no conceivable reason RK's CFO would transmit this balance sheet to Rexel *except* in response to Rexel's request for proof of the financial resources backing RKMC's payment obligations.  At no point did either RKMC or RK qualify Mr. Bates' transmission with any caveat indicating that RKMC only had access to some fraction of the funds reported on the balance sheet RK's CFO sent.  Thus, Defendants answered Rexel's request for documentation of RKMC's creditworthiness by knowingly communicating to Rexel that all the financial resources reported on RK's consolidated balance sheet were available to satisfy RKMC's payment obligations should Rexel allow RKMC to place orders on credit.

27.     Furthermore, by answering Rexel's request for proof of **RKMC's** creditworthiness with an email directly from **RK**'s CFO—that even references "***our*** most current balance sheet"—Defendants deliberately communicated to Rexel that RKMC was not seeking credit as an independent, self-contained unit, but instead was operating as a subunit of the larger RK organization.  Mr. Bates cemented the message that RK was overseeing this transaction by directing Rexel to address any questions about the financial documentation to himself—an officer of RK—rather than to anyone at RKMC.  Thus, in addition to transmitting the financial information reported on the balance sheet, Mr. Bates' email also confirmed that RK was authorizing the use of its consolidated financial resources to back RKMC's credit request.

28.     In sum, by delivering the consolidated RK balance sheet to Rexel in response to Rexel's request for proof of RKMC's financial resources, Defendants knowingly and deliberately communicated to Rexel that RKMC was not functioning as an independent entity in its dealings with Rexel, but instead, that if RKMC should default after Rexel allowed it to place orders on credit, RK's full resources (as documented in its consolidated financial statement) were available to satisfy RKMC's payment obligations.

29.     Rexel ultimately allowed RKMC to order nearly $10 million of custom goods on net-30 payment terms, without requiring any payment in advance.

**C.     Within Just a Few Months, RKMC Orders Millions of Dollars of Products on Credit, then Requests Cancellation and Refuses to Accept Delivery of Products.**

30.     As RKMC began ordering Products from Rexel, Rexel in turn placed orders with its own suppliers to fulfill RKMC's requests.  In April and May of 2022, Rexel repeatedly emphasized to RKMC that because of the volume, specialized nature, and urgency of RKMC's needs, most of Rexel's suppliers would not allow cancellation or refunds.

31.     Rexel provided RKMC written copies of the manufacturers' cancelation policies, which explained that due to the nature of the Products RKMC was ordering, cancellation requests would either be refused or would incur fees of up to 100% of the purchase price. RKMC confirmed that it wanted to proceed with the orders, and within a few months entered into purchase agreements with Rexel to purchase more than $10 million in Products on credit.

32.     RKMC performed its contractual duties for its first few orders, duly accepting delivery of the Products Rexel tendered and timely paying Rexel's invoices.  But in July 2022, RKMC informed Rexel that RKMC wanted to cancel its open orders because its customer was in financial distress.

33.     Rexel contacted the manufacturers with RKMC's cancellation requests.  But as RKMC had been warned, since the vast majority of the Products were being custom-built and/or were high volume orders already in production, the manufacturers largely asserted their rights to refuse cancellation or impose large cancellation fees.  A few orders were cancelled, and Rexel paid the manufacturers' cancellation fees on RKMC's behalf, but for the bulk of RKMC's Products, the manufacturers completed production and required Rexel to accept delivery and pay pursuant to the terms RKMC has approved.

34.     In September and then again in November 2022, RKMC asked Rexel to hold and store a total of over $3.5 million in Products RKMC had ordered, rather than Rexel delivering them pursuant to the agreed terms of sale.  Accordingly, RKMC and Rexel executed two "bill-and-hold" contracts, under which RKMC expressly agreed to pay Rexel storage fees, in addition to the Products' purchase price.  Exhibit B.  Though Rexel did exactly as RKMC asked, RKMC never paid for most of these goods *or* the mounting fees for their storage.

35.     Rexel has fully satisfied all of its contractual obligations to RKMC.  RKMC has never identified any material flaw in Rexel's performance.

**D.      Both RKMC and RK Refuse to Pay the Almost $9,000,000 RKMC Owes Rexel.**

36.     RKMC's payments to Rexel slowed to a trickle, then stopped altogether.  Because of the size of its orders, RKMC's overdue balance quickly ballooned.

37.     The parties' agreed terms of sale provide for "net-30 payment," which means RKMC's full payment for each order is due with 30 days of invoice.  Exhibit A.  Late payments accrue interest at a contractual rate of 1.5% per month (not compounding), or the maximum rate allowed by law.  *Id.*

38.     When Rexel confronted RKMC about its arrearage, RKMC did not dispute its liability or its failure to pay.  Instead, RKMC blamed its default on its own lack of funding, since it could not collect the payments due from the customer that declared bankruptcy in September 2022.  This bankruptcy is irrelevant: RKMC's obligations to pay Rexel in full for the goods it ordered are in no way dependent upon RKMC's ability to collect payment from RKMC's customers, as the parties' contractual terms *expressly* confirm.

39.     RKMC offered to pay Rexel $50,000 per week towards its outstanding balance, which RKMC claimed was the most it could manage.  By this time, RKMC's outstanding orders totaled more than $8.9 million.  Exhibit C.  With RKMC's overdue invoices accruing interest at 1.5% per month, RKMC's past-due balance would still be over $6 million two years in the future—on invoices that RKMC had contracted to pay in full within 30 days.

40.     Furthermore, RKMC almost immediately defaulted on even the wholly inadequate alternate payment plan it had been paying on.

41.     With RKMC in default and asserting a lack of financial resources, Rexel asked RK to accept liability for RKMC's overdue balance.  RK refused.  Even though RK claims RKMC as

one of its "business units," and RK deliberately induced Rexel to let RKMC place its orders on credit by presenting its own consolidated balance sheet as proof of the financial resources backing RKMC's payment obligations, RK now refuses to discharge RKMC's debts.

      **E.**    **RK Operates RKMC as a Business Unit, Including Controlling Its Finances.**

    42.    Though RK is attempting to dodge Rexel's invoices by asserting RKMC's purported independence, the evidence tells a different story: in practice, RK operates RKMC as one of its seven integrated business units, and RK is even micromanaging RKMC's finances—including the decision to default on the payments owed to Rexel.

    43.    On or about July 18, 2023, RKMC's Controller emailed Rexel to explain why RKMC had just remitted only $5,000—less than one thousandth of what it owed Rexel—in what turned out to be its final payment on its multimillion-dollar balance.  RKMC's Controller wrote:

> Overall we are pushing to get Rexel paid and Rexel is at the top of the list we submit each week to corporate for funding, [b]ut Corporate has not funded us very well recently.  You will see the best we could do was send $5K.  I hope Rexel doesn't take it as an insult, but from the RKMC side we sent what we could.

    44.    This email confirms that RKMC is not making its own decisions regarding breach of its payment obligations to Rexel.  Instead, RKMC has been "submit[ting]" a weekly list "to corporate for funding," and has failed to pay Rexel because "Corporate has not funded" RKMC adequately to satisfy RKMC's debt to Rexel.  Even though "Rexel is at the top of the list" of creditors to be paid "from the RKMC side," RKMC's Controller is being overruled by the real decisionmaker—Defendant RK.

    45.    Publicly available information about RK and RKMC—including Defendants' own statements—confirms that RKMC's "Corporate" is RK and reinforces the Controller's portrayal of RKMC as a functional subdivision of RK as opposed to an independent and distinct entity.

46.     According to RK's website,[5] RK launched RKMC eight years ago.  Then, in 2021, RK "restructure[d] corporately" in order to house RK's "seven divisions," including RKMC, each in their own "standalone LLC's"—making RK purely a "holding company" such that "all of RK's businesses are now subsidiaries of RK."  RK's website confirms that: "Corporately, RK continues to do business as RK."

47.     In their public statements, RK and its officers/directors claim RKMC as one of RK's "business units," that is ultimately controlled and managed by RK.  For example, RK's website identifies RKMC as one of RK's "business units," in a menu that links to RKMC's website, rkmissioncritical.com:



Furthermore, the website of the RK Foundation, which is run by RK officers Jon and Rick Kinning and linked from RK's website, describes RK as:

> a regional, national and international diversified service provider for mechanical contracting, custom manufacturing, steel fabrication, prefabricated construction, facilities maintenance services, electrical work and water treatment solutions. RK proudly employs over 1,000 employees **in seven business units including** Mechanical, Service, Steel, Energy, Water, Electrical and **Mission Critical**.

---

[5]  RK's history and its overview of its corporate structure may be found at https://rkindustries.com/about-us/ (last visited Sept. 25, 2023).

https://rk-foundation.org/board-of-directors/ (emphasis added, last visited Sept. 25, 2023).  It was exactly this consolidated business that RK's controller presented to Rexel to induce Rexel to extend RKMC credit—before asserting the purported independence of RKMC once payment came due.

48.    RK also claims RKMC employees as its own.  For example, RK's website features a page highlighting "RK Industries' Leadership," which integrates profiles of 23 individuals spanning RK's various business units – including four executives identified as RKMC personnel.  Furthermore, a job listing available through RK's "careers" webpage (www.rkindustries.com/careers) seeks to hire a "Director of HSE" for "Mission Critical."  The listing announces its categorization as "RK Industries, LLC Careers" and describes the employer as "RK Industries, LLC," yet the very first responsibility of this job clarifies that the position is actually for RKMC: "Provide safety leadership and supervision to assure that *RKMC* employees are aware of, and comply with [Health, Safety, and Environmental] rules, regulations and work practices and procedures" (emphasis added).

49.    RK and RKMC share physical space and telephone lines.  RKMC's corporate filings in both Colorado and Texas list RKMC's principal place of business as 3800 Xanthia Street, Denver, CO 80238—which RK's website identifies as the address of *RK*'s corporate headquarters.  Furthermore, RK also claims one of the two addresses listed on RKMC's website as the location of *RK*'s "Aurora Facility":




Finally, the telephone number RKMC provides on its website is the same number RK lists for both its Corporate Headquarters and that RK "Aurora Facility."

50.     Public filings indicate that RKMC and RK are run by the same people: Rick and Jon Kinning.  RKMC's April 20, 2022, application for corporate registration in Texas listed Rick Kinning as its "governing person."  Four months later, RKMC's Texas franchise tax public information report identified his brother Jon Kinning as the LLC's sole "officer, director, member, general partner, or manager."  According to RK's website, those same Kinning brothers also manage RK, serving as its President/Chairman/CEO and Co-Owner/Executive Vice President/COO.  Jon Kinning's online profile asserts that at RK, he "oversees all strategic planning for 7 business units (Mechanical, Service, Steel, Energy, Water, Electrical, and Mission Critical) and has direct oversight for finance, human resources, supply chain management, legal, safety, facilities, and technology."[6]  Similarly, Rick Kinnings's online profile describes him as "well-versed in all RK business units."[7]

---

[6] *See* https://www.linkedin.com/in/jonkinning (last visited Sept. 25, 2023).

[7] *See* https://rk-foundation.org/board-of-directors (last visited Sept. 25, 2023).

## V.      CAUSES OF ACTION

### A.      Alter-Ego Liability (Colorado Law)

51.     Rexel incorporates by reference all of the paragraphs above as if fully set forth here.

52.     Because RKMC and RK are both entities organized and operating under the laws of Colorado, Colorado law governs whether RKMC's corporate veil can be pierced to hold RK liable for RKMC's torts and breaches of contract.

53.     RK shares RKMC's liability under each of the claims set forth herein, under Colorado law, because (1) RKMC is the alter ego of RK; (2) RKMC's LLC form has been and is being used to perpetuate a wrong, through RK knowingly presenting Rexel its own consolidated balance sheet in order to convince Rexel to extend RKMC credit, but then after RKMC defaulted on its payment obligations, using the formality of RKMC's separate corporate entity to avoid paying Rexel what RKMC owes; and (3) disregarding RKMC's legal entity would achieve an equitable result by enforcing the arrangement Defendants presented to Rexel at the time, *i.e.*, making the consolidated financial resources of RK available to satisfy RKMC's obligations to pay for the Products it ordered on credit.

54.     RKMC is the alter ego of RK under Colorado's multifactor test, which considers whether RKMC "(1) is operated as a distinct business entity, (2) maintains its funds separately, . . . (3) keeps adequate records, (4) the nature and form of [RKMC's] LLC's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) [RK] is used as a mere shell, (7) [RKMC] members disregard legal formalities, and (8) funds or assets are used for noncorporate purposes." *Titan Feeding, LLC v. Corey Cattle Co., LLC*, No. 19-CV-02541-PAB-SKC, 2022 WL 4182458, at *8 (D. Colo. Sept. 13, 2022) (citing *TransFirst, LLC v. Brown*, 323 F.R.D. 641, 649 (D. Colo. 2018)).

55.     RKMC satisfies this test for alter ego based on the following evidence and, on information and belief, based on evidence in Defendants' exclusive possession.  RK itself confirms that it operates RKMC as a mere division or "business unit" of RK.  Indeed, RK describes itself as nothing more than a "holding company" yet claims to have over 1,000 employees and a nine-figure balance sheet in seven business units including RKMC.  RK's website reports that RK created RKMC.  RK's officers exercise authority over RKMC's employees and business decisions.  RKMC is so thinly capitalized that it claimed inability to pay Rexel more than 1/1000 of its contractual payment obligation.  RK is a mere shell for the LLC's that hold its various business divisions.  RKMC's members disregard its legal formalities and treat RKMC as a division of RK.

56.     For these and other reasons, RK is liable jointly and severally with RKMC for all causes of action pleaded herein.

**B.     Count 1: Breach of Contract**

57.     Rexel incorporates by reference all of the above paragraphs as if fully set forth here.

58.     RKMC entered into binding and enforceable contracts with Rexel, the terms of which are documented in the in the emails, quotes, and purchase orders the parties exchanged; Rexel's Terms and Conditions of Sale; the two mutually executed Bill-and-Hold agreements; and the invoices Rexel sent to RKMC.

59.     The contracts require RKMC to accept conforming goods Rexel tenders, and to pay the agreed price for the Products it ordered, within 30 days of being invoiced.

60.     The contracts also provide for financing charges accruing at the rate of 1.5% per month (18% per year) on any amounts RKMC does not pay within 30 days of being invoiced.

61.     The contracts also provide that RKMC is liable for any fees, charges, or damages Rexel incurs as a result of RKMC cancelling any order after it is placed.

62.     The contracts also provide for RKMC to pay any "reasonable attorney fees and court costs" Rexel incurs in collecting payment.

63.     RKMC failed, and continues to fail, to satisfy its payment obligations, thereby breaching its contracts with Rexel.

64.     Rexel fully performed or tendered performance of its contractual obligations to RKMC.

65.     Rexel has been damaged as a result of RKMC's breach. Its damages include, without limitation, its contractual expectation under the breached purchase agreements including lost profits, unpaid storage fees under the Bill-and-Hold agreements, cancellation fees imposed by Rexel's suppliers, expenses of storing the goods RKMC refused to accept, expenses associated with efforts to resell and/or dispose of those goods, accrued and accruing finance charges on RKMC's unpaid balance, and attorney's fees and other expenses incurred in enforcing its contractual rights.

### C.     Count 2: Tortious Interference with Contract (Defendant RK Only)

66.     Rexel incorporates by reference all of the above paragraphs as if fully set forth here.

67.     In the alternative that RK is not liable as RKMC's alter ego for breach of the Rexel-RMC contract, RK is liable for tortious interference with that contract.

68.     In Texas, "[a] claim for tortious interference with a contract consists of four elements: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) the willful and intentional interference caused damage; and (4) actual damage or loss occurred." *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 588 (Tex. 2017).

69.     Rexel had valid and enforceable contracts with RKMC that obligated RKMC to pay for the Products it ordered as well as certain associated storage, cancellation, and finance charges.

70.     RK knew about these contracts and knew that RKMC was obligated to pay Rexel according to the contracts' terms.  RK willfully and intentionally interfered with these contracts, by using RK's control over RKMC's access to funds and its influence over RKMC's employees to prevent RKMC from satisfying its payment obligations to Rexel.   Indeed, RK COO Jon Kinning claims to exercise "direct oversight for finance" for all of RK's "7 business units" including "Mission Critical."[8]

71.     RK's interference caused damage because, as RKMC's Controller reported, RKMC was trying to pay Rexel, but RK would not allow it to do so: "we are pushing to get Rexel paid and Rexel is at the top of the list we submit each week to [RK] for funding . . . [T]he best we could do was send $5K. . . . [F]rom the RKMC side we sent what we could."

72.     Actual damage or loss has occurred, including because as described in paragraph 65 *supra*, RKMC's breach has deprived Rexel of the over $9 million in payments to which it is entitled under the contracts with which RK interfered, and Rexel has also suffered consequential damages due to RKMC's breach.

73.     Due to its tortious interference with Rexel's contracts with RKMC, RK is liable for the injuries Rexel suffered due to RKMC's breach.

**D.     Count 3: Promissory Estoppel**

74.     Rexel incorporates by reference all of the above paragraphs as if fully set forth here.

---

[8] *See* https://www.linkedin.com/in/jonkinning (last visited Sept. 25, 2023).

75.     In the alternative, to the extent that an enforceable contract does not cover Rexel's procurement and storage of the Products, Rexel is entitled to the full amount of the unpaid invoices pursuant to the equitable doctrine of promissory estoppel.

76.     RKMC promised that it would pay Rexel for Products that Rexel purchased on RKMC's behalf.  Indeed, RKMC paid some of Rexel's invoices, and though it has failed to pay the balance, RKMC continued to represent that it will eventually pay the outstanding invoices.

77.     Rexel reasonably and substantially relied on RKMC's promises, to Rexel's detriment, by spending millions of dollars procuring the Products RKMC requested, and then storing those Products for RKMC.

78.     Rexel's reliance on RKMC's promise to pay for the Products RKMC requested was foreseeable by RKMC, because Rexel directly informed RKMC that it was entering into binding agreements with third parties to procure those Products for RKMC and provided RKMC copies of terms and conditions which prohibited cancellation and refunds, and/or charged significant cancellation fees.  Rexel also communicated to RKMC that the Products it was ordering were being custom-built and/or were requested in extremely large quantities, and thus Rexel would have difficulty reselling the Products should RKMC not pay for them.

79.     Injustice can only be avoided by enforcing RKMC's promise to pay for the Products because RKMC's failure to pay the amounts promised for the Products Rexel procured and stored left Rexel paying its suppliers to procure—and then incurring expenses to store—Products intended for RKMC, from which Rexel has received no benefit, and for which Rexel has been unable to either collect payment or find an alternate buyer.

**E.     Count 4: Quantum Meruit**

80.     Rexel incorporates by reference all of the above paragraphs as if fully set forth here.

81.     In the alternative, to the extent an enforceable contract does not cover Rexel's procurement and storage of the Products and promissory estoppel does not apply, Rexel is entitled to the full amount of the unpaid invoices pursuant to the equitable doctrine of quantum meruit.

82.     Rexel provided RKMC valuable services and materials by utilizing its network of suppliers to diligently place orders to purchase Products, receive Products, pay for Products, and store Products on RKMC's behalf.  Rexel expended millions of dollars to provide these services and materials.

83.     RKMC asked and instructed Rexel to perform these services and secure these materials, and Rexel's work and expenditures were performed solely for RKMC's use and enjoyment.  RKMC knew that Rexel was procuring and storing Products at RKMC's behest, and either accepted the fruits of Rexel's efforts or allow Rexel to continue without objection until it was too late for Rexel to recover the expenditures made on RKMC's behalf.

84.     RKMC was aware that Rexel, in purchasing and storing the Products, was expecting to be paid by RKMC.  Indeed, RKMC continues to assure Rexel that it will pay for the Products Rexel procured and for their storage, even though it has repeatedly failed to do so.

85.     The reasonable value of the uncompensated services and Products Rexel provided amounts to at least $8.96 million dollars.

**F.     Attorneys' Fees & Costs**

86.     Rexel incorporates by reference all of the above paragraphs as if fully set forth here.

87.     Texas Civil Practice & Remedies Code § 38.001 provides that the prevailing party in any action involving rendered services, performed labor, and an oral or written contract may be entitled to recover from the other party all reasonable attorneys' fees and costs. As Rexel's action

involves all three of these categories, Rexel seeks to recover all reasonable attorneys' fees and costs from RKMC and RK.

88.     The Terms and Conditions of Sale that RKMC consented to when it placed its orders with Rexel also provide for RKMC to pay all of Rexel's reasonable costs and expenses, including attorneys' fees, that are incurred in collecting payment RKMC owes Rexel.

89.     Federal Rule of Civil Procedure 54(d) provides that the prevailing party in an action is entitled to costs unless other law or a court order requires otherwise. As no other law prohibits Rexel from being awarded costs in this case, Rexel also seeks to recover all costs incurred from RKMC and RK under Rule 54.

### G.     Conditions Precedent

90.     All conditions precedent to Rexel's right of recovery have occurred or have been fulfilled.

### VI.    PRAYER FOR RELIEF

Wherefore, Rexel prays for the following relief:

A.      That defendants RKMC and RK be cited to appear and answer herein;

B.      That on final trial plaintiff Rexel recover judgment against defendants RKMC and RK for Rexel's damages (including, but not limited to, unpaid invoice amounts for the purchase price and storage of Products, finance charges, supplier cancellation fees, and any other costs associated with receipt, storage, and efforts to resell or dispose of Products), attorneys' fees, expert fees, and other expenses of collection;

C.      That the Court award plaintiff Rexel prejudgment and post-judgment interest in the maximum amount permitted by law;

D.      That the Court award plaintiff Rexel costs of court; and

E.      That the Court award plaintiff Rexel such other and further relief to which Rexel may show itself justly entitled.

## VII.   JURY DEMAND

Rexel demands a trial by jury of all claims and issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: October 10, 2023                    Respectfully submitted,

*/s/ Leah B. Buratti*
Katherine Chiarello
State Bar No. 24006994
katherine@bccaustin.com
Leah B. Buratti
State Bar No. 24064897
leah@bccaustin.com
Kavid V. Singh
State Bar No. 24094259
kavid@bccaustin.com

BOTKIN CHIARELLO CALAF PLLC
1209 Nueces Street
Austin, Texas 78701
T: (512) 566-3909
F: (737) 289-4695

**ATTORNEYS FOR PLAINTIFF
REXEL USA, INC.**